# ORIGINAL

## WORLD WRESTLING ENTERTAINMENT, INC.
## VIDEO LICENSE AGREEMENT

THIS WORLD WRESTLING   ENTERTAINMENT, INC. VIDEO LICENSE AGREEMENT ("Agreement"), entered into on this _17ᵗʰ_ day of _January_ , 2002 ("Effective Date"), by and between WORLD WRESTLING ENTERTAINMENT, INC., a Delaware corporation with its principal office at 1241 East Main Street, Stamford, Connecticut 06902 ("WWE"), Total Sports Asia Ltd. (352833-A), an agent working on behalf of WWE ("Agent") whose registered office is at 1309 13ᵗʰ floor Block A Phileo Damansara II, 15, Jln. 16/11, Selangor Darul Ehsan, 46350, Malaysia and BM Korea with its principal office at F2 Yushin Building, 187-7, Hankangro-2Ka, Youngsan-Ku, Seoul, Korea (the "Licensee").  In consideration of the promises and undertakings set forth below, and for other good and valuable consideration, the receipt and sufficiency of which are hereby established, WWE and Licensee hereby agree as follows:

1.  Definitions.  For purposes of this Agreement the following definitions shall apply:

     a)  The term "Advertising Materials" shall mean all advertising and promotional materials and all packaging, wrapping, and labeling materials for the Licensed Products (including, by way of illustration but not limitation, television commercials, radio ads, print ads, catalogs, trade advertisements, sweepstakes, promotions, flyers, sales sheets, labels, package inserts, hangtags, and displays) which are produced by or for the Licensee and which make use of, reference and/or exploit the Intellectual Property.

     b)  The term "Copyrights" shall mean all copyrights now or hereafter owned by WWE relating to the Events.

     c)  The term "Events" shall mean the professional wrestling events produced, promoted, and performed by WWE, whether live or tape delayed and whether via television, satellite or any other method of dissemination now known or hereinafter discovered, provided however, that the term "Events" shall not under any circumstances be defined to include (i) any comic, cartoon, or animated events and (ii) any characters, characterizations, designs or visual representations of such comic, cartoon or animated events, which includes by way of example and not limitation in each of the foregoing instances depictions taken from comic books, magazines, animated television programs and comic, cartoon or animated internet events, even if such events (or the characters, designs or visual representations taken therefrom) are subsequently produced, promoted or performed by WWE.

     d)  The term "Intellectual Property" or "Licensed Marks" shall mean the Trademarks, and/or Copyrights in such form as they may exist from time to time in WWE's sole discretion and which are owned by WWE. For the avoidance of doubt and without any limitation hereof the foregoing definition of "Intellectual Property" shall not include any intellectual property involving or related to the WWE property known as "Tough Enough" and/or any of its designs, logos or products in any manner whatsoever; any WWE owned, sponsored, and/or distributed non-professional wrestling program, all which are all specifically excluded from this Agreement.

i\Department\Legal Affairs\Consumer Products License Agreements\Video License Agreements\BM Korea 2002 2 Final.doc

e) The term "Licensed Products" shall collectively mean the use of the WWE Intellectual Property in a form and manner approved by WWE pursuant to the terms hereof, on only the following Videos, DVDs or VCDs and provided such use is in accordance with the release dates set forth in section 2(d). For clarity purposes, the twelve (12) pay-per-view events (listed herein) are referred to as the "PPV Events". The specials are referred to as "Specials":

- Vengeance 2002, 2003, 2004, 2005
- Summer Slam 2002, 2003, 2004, 2005
- Unforgiven 2003, 2004, 2005
- No Mercy 2003, 2004, 2005
- Survivor Series 2002, 2003, 2004
- Armageddon 2002, 2003, 2004
- Royal Rumble 2003, 2004, 2005
- No Way Out  2003, 2004, 2005
- WrestleMania  2003, 2004, 2005
- Backlash  2003, 2004, 2005
- Judgment Day  2003, 2004, 2005
- King of the Ring 2003, 2004, 2005
- At least 6 Specials per Contract Year (as determined by WWE) (e.g. Divas: Tropical Pleasure). Number of videos and release dates to be determined by WWE in its sole discretion.  However, WWE's failure to provide any Specials shall not be deemed a breach hereof.

Licensee shall not have rights to any other product not listed as a Licensed Product above.

WWE reserves the right to change the name of any Title (defined below).

f) The term "Wholesale Sales Price" shall mean the Licensee's invoiced billing price to its customers or distributors for the Licensed Products less returns for damaged goods.

g) The term "Territory" shall mean South Korea.

h) The term "Title" shall mean the name of each individual Video, VCD and/or DVD listed as a Licensed Product, however, Licensee shall comply with Section N(1) with regard to any edits.

(i) The term "Trademarks" shall mean all symbols, designs, styles, emblems, logos, and marks now known or in the future created and in whatever style and/or form determined by WWE in its sole discretion and which are owned by WWE and used in connection with the Events including, but not limited to, the name WORLD WRESTLING

2

ENTERTAINMENT, INC., the WWE scratch and scar logo or logos, the names and logos of the Events, and the names, nicknames, logos, expressions or other distinctive and identifying indicia of WWE talent, but excluding the initials WWF in any form.

2. Grant of License; Channels of Distribution Reserved to WWE.

a) Grant of License.

(i) Licensed Products. WWE grants to Licensee, upon the terms and conditions set forth in this Agreement and subject to any sell off period previously granted to any other licensee for the Territory, the exclusive right and license to use the Intellectual Property in connection with the manufacture, duplication, replication, distribution and sale, of only the Licensed Products in the Territory (and only to end users that will exhibit the Licensed Products on television sets for residential viewing only) during the term of this Agreement, as defined below, through all retail channels of distribution (including the rental market) except those specifically reserved to WWE under subparagraph 2(b) or those specifically prohibited by subparagraph 2(c) and pursuant to the schedule set forth in section 2(d). The right and license granted by WWE hereunder shall however pertain only to the items specifically described and set forth in subparagraph 1(e) above entitled "Licensed Products."

(ii) The rights granted to Licensee do not include the right to authorize the use of the Titles for viewing: (1) for commercial viewing including but not limited to any place of public assembly, whether an admission fee is charged or not, for broadcasting by television, cable, Internet or other method of dissemination now known or hereinafter discovered, whether free or for pay, for theatrical or non-theatrical exhibition, except for the promotion of the Titles, or (2) in any form other than as originally provided to Licensee by WWE.

(iii) Advertising Materials. During the term, as defined below and only within the Territory, WWE grants to Licensee, upon the terms, conditions, and definitions set forth throughout this Agreement, the right and license to use the Intellectual Property in connection with the design, development and distribution of Advertising Materials for the Licensed Products.

b) WWE's Channels of Distribution

Unless specifically stated to the contrary herein (or approved in advance in writing by WWE), the rights granted to the Licensee by WWE under Subparagraph 2(a) shall not include the right to sell, distribute, manufacture, market, display and/or advertise the Licensed Products through any of the following channels of distribution which are reserved specifically for use by WWE: (i) WWE catalogs; (ii) WWE direct mail sales methods; (iii) WWE television, any Internet sites operated by WWE or licensed by WWE to third parties (e.g. wwe.com; wweeurshop.com; wwekoreashop.com) or other electronic media now known or hereinafter discovered including video on demand; (iv) WWE vending machines; (v) WWE entertainment site based complexes; and (vi) the Internet (Worldwide Web). For the purpose of clarity, it is understood and agreed that the Internet (Worldwide Web) is a channel of distribution reserved to WWE and as such Licensee may not sell and/or distribute the Licensed Products on any Internet website without the prior written approval of WWE. Notwithstanding the above, it is acknowledged and agreed that Licensee shall be entitled to sell the Licensed

3

Products via the Licensee's own website and to grant the right for retailers of the Licensee to sell the Licensed Products via their own retail websites provided that nothing contained herein shall grant the Licensee the right to exploit the Licensed Products by means of digital download or digital streaming via the internet, such rights being retained exclusively by WWE and provided that any internet sales are limited to sales within the Territory.

c) <u>Prohibited Channels of Distribution.</u> Licensee shall not sell or transfer the Licensed Products in any manner to any party or entity, within the Territory, other than to a wholesaler or retailer, as those terms are customarily understood. Furthermore, Licensee may not sell, without WWE's approval, to any wholesaler or retailer or any other entity when Licensee knows or has reason to believe that the Licensed Products will ultimately be sold to the consumer by e-commerce Internet sites, by street vendors or any such other similar non-conventional manners of distribution.

d) <u>Schedule of Distribution.</u>  Licensee shall distribute the Licensed Products as follows: for the twelve (12) PPV Events the release date shall be no earlier than two (2) days following the broadcast showing of the PPV Event ("Release Dates") in the Territory, and for the six (6) Specials the release date shall be no more than twenty-one (21) days after the U.S. release date.

3.  <u>Period of Agreement.</u>  The period of this Agreement shall commence on November 1, 2002 and end on October 31, 2005 unless terminated earlier pursuant to the terms hereof (the "Term"). Each individual year of the Agreement may also be hereafter referred to as a Contract Year (i.e. November 1, 2002 through October, 2003 is the First Contract Year; November 1, 2003 through October 31, 2004 is the Second Contract Year and November 1, 2004 through October 31, 2005 is the Third Contract Year.) Notwithstanding anything herein to the contrary, at any time after June 30, 2004, Licensee shall have the right upon ninety (90) days prior written notice to WWE to terminate this Agreement. Pursuant to the terms herein Licensee shall be responsible for the payment of any unpaid balance or royalties due.

4.  <u>Royalties.</u>  In consideration of the rights granted to it under this Agreement, the Licensee agrees to pay WWE the following royalties:

a)  <u>Royalty Payments.</u>

(i)  On execution of this Agreement, the Licensee agrees to pay to WWE the following non-refundable Advance Royalty Amounts, which shall be set off as a credit only against royalties due WWE for the First Contract Year pursuant to Subparagraph 4(c):

<u>Advance Royalty Amount</u><br>$36,000.00

If WWE has not received the Advance Royalty Amount upon the execution of this Agreement, WWE shall have the right to terminate this Agreement, with immediate effect, by providing the Licensee with written notice of termination.

b)  <u>Percentage Royalties.</u>  Percentage royalties shall be computed as follows:

4

(i) Royalty Rate. Licensee shall pay WWE a percentage royalty of Twenty percent (20%) of the Wholesale Sales Price or One and 70/100 US Dollars (US$1.70) per Title, whichever is greater, on all sales of the Licensed Products by the Licensee to its customers or distributors.

(ii) All royalty computations under this Subparagraph 4(b) shall be made on the basis of the Wholesale Sales Price charged by the Licensee, or, if the Licensee sells a Licensed Product to a subsidiary or other party controlled by the Licensee, on the basis of the Wholesale Sales Price for such Licensed Product charged by such subsidiary or controlled party on resale of the Licensed Product.

c) Annual Minimum Guarantee.

(i)   Licensee guarantees that the royalty payments to WWE shall not be less than the amount set forth opposite such Contract Year referenced below for each country in the Territory ("Annual Minimum Guarantee") and guarantees to pay the Minimum Annual Guarantee Amount owed for each country in the Territory each Contract Year in that Contract Year pursuant to Section 4(c)(i):

| CONTRACT YEAR | MINIMUM ANNUAL GUARANTEE DUE |
|---|---|
| First Contract Year | US $144,000.00 |
| Second Contract Year | US $144,000.00 |
| Third Contract Year | US $144,000.00 |

The aggregate royalties paid to WWE during each Contract Year may exceed the Minimum Annual Guarantee for such Contract Year.

(ii) Reconciliation of Minimum Annual Guarantee:  The minimum amount of royalties to be paid by Licensee to WWE, which shall be payable within thirty (30) days after the close of each Calendar Quarter, as defined below, shall be equal to: (1) one-fourth (25%) of the Minimum Annual Guarantee for such Contract Year or (2) the actual royalty amount due pursuant to section 4(b) should the total of that amount be greater than 25% of the Minimum Annual Guarantee for the Contract Year at issue.  Calendar Quarters are identified as follows:

| Payment Quarters | Close of Calendar Quarter | Royalty Payment Due |
|---|---|---|
| First Quarter | March 31st | April 30th |
| Second Quarter | June 30th | July 30th |
| Third Quarter | September 30th | October 30th |
| Fourth Quarter | December 31st | January 30th |

5

(iii)   <u>Acceleration Clause</u>:  In the event this Agreement is terminated early for any reason whatsoever, Licensee shall remain obligated to pay the Annual Minimum Guarantee set forth above and remaining under the Agreement as of the date of termination, less any payments previously made under Paragraphs 4 (a) and (b) above.

(iv)   <u>Cross Collateralization</u>.  Any royalty payment for a unit of Licensed Product sold will only be applied against the Minimum Annual Guarantee for such country in the Territory for such Contract Year in which the unit of such Licensed Product was sold (i.e. any shortfall in, or payment in excess of the Minimum Annual Guarantee for a country in the Territory for a Contract Year may not be offset or credited against the Minimum Annual Guarantee for a country in the Territory for any other Contract Year).  If Minimum Annual Guarantees are stated separately for different categories of Licensed Products (or for different countries with the Territory), royalty payments resulting from Wholesale Sales of a category of Licensed Product (or from Wholesale Sales of a country) will be applied only against the Minimum Annual Guarantee for such category of Licensed Product. Notwithstanding anything herein to the contrary, if during a Contract Year Licensee has made royalty payments pursuant to section 4(b) such that those royalty payments exceed the Minimum Annual Guarantee required to be paid per quarter pursuant to 4(c), Licensee shall continue to make payments which shall be the greater of the Minimum Annual Guarantee pursuant to 4(c) or the royalty due pursuant to section 4(b) until the last quarter of the Term.  Prior to the final quarter payment during a Contract Year and only during a Contract Year, in accordance with this Agreement Licensee may then pay the difference between the royalties paid less the Minimum Annual Guarantee amounts owed.  For example, if Licensee has a Minimum Annual Guarantee of $100,000 such that Licensee is required to pay $25,000 each quarter however, Licensee earned royalties such that during the first and second quarter Licensee paid WWE $35,000 and $30,000 respectively and during the third quarter Licensee made sales such that the royalty amount due WWE only equaled $5,000, Licensee shall still be obligated to pay WWE the quarterly payment of the Minimum Annual Guarantee Amount of $25,000.  However, should Licensee only make sales such that WWE was due a royalty payment of $2,000 during the final quarter, Licensee shall only be obligated to pay WWE $10,000 to satisfy the Annual Minimum Guarantee Amount for that Contract Year only ($35,000 + $30,000 + $25,000 + $10,000 = $100,000).

5.  <u>Delivery, Cost of Masters and Packaging</u>.

(a)  <u>Videotape and DVD Masters.</u>  Subject to the timely payment of fees as set forth in the preceding section, WWE agrees to deliver to Licensee the artwork fifteen (15) days following the live airing in the United States and agrees to deliver to Licensee one diga beta videotape in NTSC format fourteen (14) days following the live airing in the United States and one NTSC formatted DLT clone thirty (30) days following the live airing in the United States. WWE shall provide Licensee an invoice, which must be paid by Licensee within twenty (20) days from the date of receipt, for $1,000.00 per NTSC DLT clone.  Should Licensee fail to submit payment as set forth herein, WWE shall have no obligation to deliver future DLT masters and such failure shall not excuse Licensee of its obligation to remit the payments set forth in Section 4(c) and further, such failure shall in no way be considered a breach hereof.

6

(b) Licensee shall only obtain the creative material and artwork in respect of DVD and VHS packaging via WWE's online secure website and thereafter comply with WWE approval procedures as set forth herein.. Licensee shall not be entitled to use any other creative material, artwork or otherwise will be permitted.

(c) At the end of each Calendar Quarter, beginning with December 31, 2002, Licensee shall provide WWE with a report detailing which videotape or DLT, if applicable, masters Licensee requires. Should Licensee fail to provide such notice, Licensee shall be responsible for any and all costs incurred by WWE for the manufacture of any masters for that Calendar Quarter.

(d) Notwithstanding anything herein to the contrary, all prices set forth in this Section 5 are subject to change by WWE upon thirty (30) days prior notice to Licensee.

6. <u>Licensee Obligation</u>. Licensee, at its sole cost and expense, shall be responsible for replication (if any), duplication and distribution of the videotape and DLT master and copies, and any and all marketing and sales related to the Licensed Product.

7. <u>Non-Competition</u>. Licensee, its parent, subsidiaries, affiliates, successors, assigns and related companies agree that they shall not, while this Agreement remains in effect and for one (1) year thereafter, produce any products or provide any services in the Territory, including by way of example and not limitation advertisements, promotions and/or sponsorships, using (a) the names, logos or other trademarks or service marks associated with any professional wrestling organization other than WWE and/or (b) the names and/or likenesses of any professional wrestlers not associated with WWE.

8. <u>Submission of Marketing Plans/Monthly Reports</u>.

a) <u>Marketing Plans</u>. Each Contract Year, Licensee shall spend not less than five percent (5%) of the Gross Revenue received. "Gross Revenue" shall be defined as the total amount Licensee receives from a retail customer. (This amount may include airtime purchases on WWE programming in the Territory)

Within ninety (90) days of the execution of this Agreement, and ninety days (90) before the release of a Title, Licensee will provide WWE with a written marketing plan with respect to the Licensed Products; such marketing plans to be submitted as WWE shall from time to time direct via mail and/or via the Internet through a digital asset storage and management system  to be identified by WWE or another system identified by WWE. Each such marketing plan will include, on a Licensed Product-by-Product basis, a marketing timetable, sales projections by Title, by year and quarter, channels and methods of distribution, on sale dates, the nature and amount of the anticipated advertising and advertising expenditures associated therewith and any other information that WWE may reasonably ask Licensee to include related to the manufacture, marketing, sale and distribution of the Licensed Products. Each marketing plan will contain specific information for the one (1) year period immediately succeeding its submission ("Immediate Year Projection") and general estimates or projections for the subsequent periods during which this Agreement remains in effect beyond the

7

Immediate Year Projection.

b) <u>Monthly Financial Reports</u>.  On the last Friday of each month during the Term of this Agreement and at the close of each Calendar quarter during the Term hereof, Licensee will provide WWE with a written financial report updating the Immediate Year Projection, providing comparisons of actual WWE sales of the Licensed Products against the projection of such sales and compiling any such other information WWE may reasonably request related to the manufacture, marketing, distribution and sale of the Licensed Product herein; such reports to be submitted to WWE via the Internet through a digital asset storage and management system to be identified by WWE and/or via such other methods directed by WWE.

9.   <u>Display of Official Label</u>.

a)   Licensee agrees and shall undertake to attach to each Licensed Product and/or its container an "Officially Licensed WWE Product!" hologram label in a form prescribed and/or approved by WWE ("Official Label").  During the Term hereof, Licensee agrees to purchase at its own cost and expense its Official Label(s) from WWE's approved hologram supplier.  The specific details and instructions necessary for the purchase of the Official Label(s) shall be provided to Licensee shortly after the execution of this Agreement.  In addition, Licensee shall also cause its own name to appear on each Licensed Product and/or its container on a tag or label in a form prescribed and/or approved by WWE.  Failure to attach an Official Label to the Licensed Product is a material condition to this Agreement; the breach of which shall be cause for immediate termination hereof.

b)   Licensee agrees to defend, indemnify and hold WWE and its licensees, successors and assigns, parent corporation, subsidiaries and affiliates and its and their respective officers, directors, employees, advertisers, insurers, and representatives harmless from any and all liabilities, claims, suits, costs, judgments, damages, including but not limited to reasonable attorney fees including an appropriate allocation for in house counsel, related in any manner to Licensee's failure to comply with the terms and conditions of paragraph 9(a) above, which includes without limitation (i) Licensee's failure to affix the Official Label and/or its own name to any Licensed Product or its container pursuant to this paragraph 9(a) above and/or (ii) related in any manner to the seizure of any of the Licensed Products by WWE or its authorized representatives as a result of a breach of the terms and condition of this paragraph 7.  This provision is in addition to and in no way limits Section H in the Standard Terms and Conditions attached hereto.

10.   <u>Agent Representations and Warranties</u>.  Agent shall ensure Licensee's compliance with the terms and conditions of the Agreement and, in the case of a dispute, Agent shall cooperate and assist WWE in any manner possible with a resolution that meets the needs of WWE.  To that end, Agent shall ensure that Licensee complies with, among the other terms and conditions set forth herein, the following matters:

(a)   <u>Sequencing of PPV Events</u>: Agent will advise and inform Licensee (and assist in the scheduling if necessary) so that the PPV Events are distributed in a predetermined, sequential episodic order ("Sequencing") in order to preserve the continuity of storylines for WWE programming in general.  As such, Agent will use its best efforts to coordinate and ensure that such Sequencing is maintained within the Territory.

8

(b)   <u>Collection of Licenses Fees:</u> Agent shall use best efforts to collect from Licensee all license fees payable to WWE with respect to the Licensed Products and remit payment to WWE.  Agent shall, while this Agreement remains in effect and thereafter, co-operate with WWE in any manner reasonably requested by WWE in connection with the auditing of the Licensee and with the collection of any license fees due and owing from the Licensee hereunder.

(c)   <u>Edits.</u>  Except as otherwise set forth herein, Agent shall ensure that Licensee shall not make, and shall not authorize or permit any third party to make any intermissions, modifications, deletions, cuts, alterations, or changes of any kind in or to the Licensed Products, including, without limitation, the titles of the Licensed Products, the copyright notices or credits from the main or end titles of the Licensed Products, other materials supplied by WWE, or the continuity of the Licensed Products, without the prior written consent of WWE; provided, however, that Licensee shall be permitted to make deletions, cuts, alterations, or changes for censorship purposes only solely to the extent required by law within the Territory and provided the terms of subparagraph (d) below are strictly complied with.

(d)   <u>Censorship</u>: Agent shall notify WWE in writing within a reasonable period of time (not to exceed sixty (60) days) after the initial release of a Title within the Territory of any censorship problems incurred by Licensee.  The notice sent to WWE by Agent shall indicate the specific Title at issue and the censorship problem.

(e)   <u>Voice Overs; Assignment of Rights:</u>  Licensee sells, assigns and transfers to WWE its entire, worldwide right, title and interest in and to all "new works" or "derivative works" (including all Subtitle/Dubbing/Voice Over Work), as defined under the United States Copyright Act and all other such applicable laws,  previously or hereafter created, using, referencing or exploiting the Intellectual Property, including but not limited to the copyrights thereon and/or related to the Licensed Products (collectively the "Works").  If parties who are not employees of Licensee, make or have made any contribution to the creation of the Works, so that such parties might be deemed to be "authors" of such Works as that term is used under present or future United States copyright statutes or other such applicable laws, Licensee shall obtain from such parties a full assignment of rights so that the foregoing assignment by Licensee vests in WWE full rights to, and interest in, the Works, free of any claims, interests or rights of other parties. Licensee shall not permit any of its employees to obtain or reserve by oral or written employment agreements any rights as "authors" of such Works.  Where Licensee fails to protect WWE's right, title and interest in the Licensed Products, Licensee shall fully indemnify WWE from any loss, damage or injury incurred as a result thereof.  At WWE's request, Licensee shall furnish WWE any and all information concerning the creation of Works and copies of any and all assignments of rights obtained from the foregoing parties.

(f)   <u>Music Performance Rights</u>.  If applicable pursuant to the laws in the Territory, Agent shall monitor Licensee's report of all uses of the music contained in the Licensed Products to the applicable performing rights society in the Territory.

(g)   <u>Rights of WWE in Marks.</u>

9

(i) <u>Intellectual Property</u>. Agent shall not (and Agent shall use best efforts to insure that Licensee shall not) (a) acquire or claim any right or interest in the Intellectual Property or the Licensed Products; (b) make any commercial, promotional, or other use of the Intellectual Property or the Licensed Products (including, without limitation, on letterhead, in telephone directory listings, or on business cards), except as WWE may specifically authorize in writing. All uses of the Intellectual Property or the Licensed Products by Agent or the Licensees shall inure to the benefit of WWE.

(ii) <u>Work for Hire</u>. Agent acknowledges that WWE is the sole and exclusive owner in perpetuity of the Intellectual Property rights and any other exploitation rights related thereto. Agent acknowledges that any and all rights, products or materials derived from the Intellectual Property, the Licensed Products and/or the services rendered by Agent herein (the "Work"), shall constitute a "work made for hire" under the copyright laws of the United States or any other applicable law and WWE shall own all and any right, title or interest in and to the Work, in perpetuity, including without limitation, any copyright, trademark or patent resulting therefrom. If, under any applicable law, the fact that "work made for hire" is not effective to place full authorship and ownership in WWE (or the Work is not eligible to be considered a work made for hire), then to the fullest extent allowable under such applicable law, Agent hereby irrevocably and exclusively grants and assigns to WWE and its successors and assigns throughout the universe, in perpetuity, all rights, title and interest of every kind of nature and to the Work. Agent hereby assigns and transfers to WWE, all of the foregoing, without reservation, condition or limitation and no right of any kind, nature or description is reserved by Agent.

(h) <u>Restrictions on Rights Granted to Licensees</u>: Agent shall not authorize Licensee to exhibit or distribute any of the Licensed Products or in any way use or exploit any of the Intellectual Property via any other method of distribution, dissemination or video format other than those set forth herein, regardless of the purpose or intent, beyond the expiration date set forth in this Agreement.

11. <u>Licensee Acknowledgement</u>. The Licensee by executing this Agreement acknowledges that it has reviewed and understands all provisions of this Agreement, including the attached Standard Terms and Conditions.

12. <u>Standard Terms and Conditions</u>. This Agreement is subject to all of the provisions of the Standard Terms and Conditions that are attached to and made a part of this Agreement by reference.

13. <u>Attorney Acknowledgement</u>. Each of the parties have reviewed the terms of this Agreement with their respective attorneys and, as a direct result, thereof, have participated in the drafting of this Agreement. Therefore, the language of this Agreement shall not be presumptively construed in favor of or against any party hereto. Based on the foregoing, the parties have executed the Agreement with the consent and acknowledgement of their attorneys.

IN WITNESS WHEREOF, the parties with the intent to be legally bound have executed this Agreement as of the date set forth above.

Agreed to and accepted:

On Behalf of

WORLD WRESTLING
ENTERTAINMENT, INC.
("WWE")

By: _____

Donna Goldsmith
Senior Vice President
Consumer Products

Date: _____1.17.03_____

On Behalf of

BM KOREA
("Licensee")

By: _____羅　相　鎭_____

Print Name: _비엠코리아株式會社_

Title _president_

Date: _January. 6. 2003._

On Behalf of

TOTAL SPORTS ASIA LTD.
("Agent")

By: _____

Print Name: ___Marcus Luer___

Title___Managing Director___

Date: _January 2, 2003_

11

WORLD WRESTLING ENTERTAINMENT, INC.
LICENSE AGREEMENT STANDARD TERMS AND CONDITIONS

SECTION A.   QUALITY CONTROLS AND APPROVAL PROCEDURES FOR LICENSED PRODUCTS AND ADVERTISING MATERIALS

A(1)   Warranty of Quality.  The Licensee warrants, represents and guarantees that the Licensed Products will be of good quality in design, material, and workmanship and will be suitable for their intended purpose; that no injurious, deleterious, or toxic substances will be used in or on the Licensed Products; that the Licensed Products will not cause harm when used as instructed and with ordinary care for their intended purpose; and that the Licensed Products will be manufactured, sold, and distributed in strict compliance with all applicable laws and regulations.  Licensee agrees not to ship, sell or have its manufacturer(s) ship or sell any Licensed Products or component parts of the Licensed Products containing the Intellectual Property if they are damaged, defective, irregular, seconds, or otherwise unacceptable to the Licensee and/or WWE.

A(2)   Approval Procedures for Licensed Products and Advertising Materials; Approval Standards; Time for Approval by WWE.

   a)   General.  Licensee shall comply with all reasonable procedures which WWE may from time to time adopt regarding its approval of Licensed Products and Advertising Materials.  These approval procedures shall thereafter be implemented by Licensee using forms supplied and/or approved by WWE and such forms shall thereafter be submitted to WWE through the Internet via a digital asset storage and management system to be identified by WWE and/or via such other methods of submission directed by WWE from time to time throughout this Agreement.  It is acknowledged and agreed by Licensee that these approval procedures shall incorporate, at a minimum, the basic approval requirements and steps outlined in the following subparagraphs of Section A and such other requirements as from time to time requested by WWE, as WWE shall determine in its best interest.  Licensee agrees to retain all materials relating to approvals in its files while this Agreement remains in effect and for one (1) year thereafter.

   b)   Time for Approval by WWE.  WWE agrees to use reasonable efforts to notify the Licensee in writing of its approval or disapproval of any materials submitted to it under this Section A(2)(b) within fifteen (15) business days after its receipt of such materials, and agrees, in the case of its disapproval, to notify the Licensee in writing of its reasons for disapproval.  In the event WWE fails to approve or disapprove of any materials submitted as provided for above within twenty (20) business days after WWE's receipt of such materials, the materials shall be deemed disapproved.

   c)   Limitations on Approval.  WWE's approval of a Licensed Product shall not be construed in any way as an acknowledgement that such Licensed Product is in compliance with the warranty of quality asserted by Licensee in subparagraph A(1) above and/or that such Licensed Product is in compliance with any and all applicable laws,

12

regulations and industry standards. Instead the production of random samples of the Licensed Products during the approval process is required for the purposes of monitoring Licensee's adherence and compliance with internal WWE policies and procedures concerning the WWE brand, which includes without limitation the look, depiction and style of the Licensed Products and, to that end such internal review by WWE shall not be construed in any way as WWE's approval of any warranty (express or implied) for the Licensed Products. With regard to the Licensed Products compliance with the warranty of quality asserted in subparagraph A(1) and/or in all applicable laws and regulations in the Territory, it is understood and agreed that WWE shall rely solely on the representations and warranties of Licensee hereunder. For the purposes of absolute certainty, WWE's approval of a design for a Licensed Product in no way acknowledges that the submitted product is in compliance with any and all such applicable laws within the Territory and furthermore is in no way an approval of the underlying product upon which the design is depicted.

d)   Revocation of Approval:   In the event that: (i) the quality, appearance, material or style of any Licensed Products cease to meet standards previously approved by WWE; (ii) Licensee uses the Intellectual Property, in an improper or unauthorized manner or such use violates any of the terms of this Agreement or (iii) there is an occurrence or factor connected with any such Licensed Product which, in the opinion of WWE, reflects unfavorably upon the professional or business reputation of WWE, then, in such event, WWE will have the right, in its sole discretion, to immediately withdraw and/or revoke its approval for such Licensed Product.   In the event of such withdrawal or revocation, WWE will provide immediate written notice to Licensee and Licensee will, upon receipt of said notice, (i) cease the use of the Intellectual Property at issue and/or the sale, distribution, advertisement or use of the Licensed Product at issue as directed by WWE's written notice and (ii) such Licensed Product will then immediately be withdrawn from market and destroyed.   If there are other Licensed Products for which approval has not been withdrawn or revoked pursuant to this Section, then this Agreement will remain in full force and effect as to such other Licensed Products.   Licensee will provide written confirmation to WWE that any Licensed Products, have been promptly and properly deleted from Licensee's product lines.

e)   Change of WWE Marks or Logos.   WWE shall have the right in its sole discretion and for whatever reason, to change the WWE marks or logos and Licensee shall do so immediately.   No such change shall result in a breach of this Agreement.   In such case, WWE shall have the right to revoke any and all products pursuant to Section A(2)(h) and WWE shall not be responsible for any and all costs associated therewith.

A(3)   Miscellaneous.

a)   Artwork for Licensed Products.   Subject to provisions set forth in Section A(3)(f), if Licensee requests WWE to furnish it with any photographs or artwork incorporating the Intellectual Property, such as by way of example and not limitation any CD-ROM art bank provided to Licensee by WWE at or about the execution of this Agreement, Licensee agrees to reimburse WWE for its cost and expense of supplying such materials to the Licensee in accordance with WWE's then current policies regarding same which shall include but shall not be limited to duplication and copying costs.   Licensee furthermore understands and agrees that it shall not supply any duplicates of films, or any photographs, artwork or other reproductive

13

media incorporating the Intellectual Property to any third party (including other WWE licensees) without the specific written permission of WWE

b)   Use of Talent in Licensed Products and Advertising Materials.  Without prior written consent of WWE, Licensee shall not be allowed to use any Talent or any items contained within the definition of Intellectual Property as set forth above for the purpose of an explicit endorsement of any Licensed Product, the Licensee and/or any of the Licensee's services.

c)   Use of Intellectual Property on Licensee Business Forms.  No use of the Intellectual Property will be permitted by Licensee to be used on its stationery, envelopes, business cards, invoices, statements, packing slips or other similar documents or materials unless approved in advance in writing by WWE.

d)   Expense Chargeable to WWE.  Licensee will not incur or create any expense chargeable to WWE without the prior written approval of WWE.

SECTION B.   EFFORTS TO MANUFACTURE, DISTRIBUTE, SELL AND OTHERWISE EXPLOIT THE LICENSED PRODUCTS; RESTRICTIONS ON SALE; COMPLIANCE.

B(1)   Efforts to Design and Manufacture the Licensed Products.

a)   Manufacture of Sufficient Quantities of the Licensed Products.  Licensee will manufacture the Licensed Products at Licensee's own expense in sufficient quantities to meet the reasonably anticipated demands of the trade, the industry and the general public.

b)   Good Faith Effort to Exploit Rights.

If within three (3) months of the execution of this Agreement, Licensee has failed to take any good faith steps to exploit the rights granted to it (for example, by seeking to obtain WWE's approval of a proposed Licensed Product), WWE shall have the immediate right to terminate this Agreement and/or rescind the exclusive nature of the Agreement, as shall be determined in WWE's sole discretion, by giving written notice to the Licensee.  If within six (6) months of the execution of this Agreement the Licensee has failed to submit to WWE a prototype of each item of the Licensed Products intended for production, distribution and sale, then such Licensed Products which have not been developed into a prototype shall either be automatically deleted from the definition of "Licensed Products" under subparagraph 1(e) of this Agreement and all rights to such Licensed Product shall revert to WWE or the exclusive rights for such product shall be automatically rescinded and converted into a non-exclusive product; in either case such determination shall be made in WWE's sole discretion.

B(2)   Efforts to Distribute the Licensed Products.

a)   Licensee will make and maintain adequate arrangements for the distribution and timely delivery of Licensed Products to retailers within and throughout the Territory.  In addition, Licensee will give the Licensed Products wide distribution   and will not, in

14

accordance with the selling practices set forth in this Agreement and consistent with Licensee's customary criteria and reasonable business judgment, refrain for any reason from selling Licensed Products to any particular channel of distribution within the Territory, except as noted in paragraph 2 of this Agreement, that may desire to purchase Licensed Products and whose credit rating and marketing image warrants such sale.

      b) In the event Licensee sells or distributes other licensed merchandise of a similar grade or quality as the Licensed Products, but which do not bear any Intellectual Property, Licensee will not discriminate, in a manner which adversely impacts the Licensed Product, in the granting of commissions and discounts to salesmen, dealers and distributors between the Licensed Products and the licensed products of any third party. Licensee may not package the License Products in combination with other products, whether similar or different, without the prior written approval of WWE.

B(3)   <u>Efforts to Market, Promote or Advertise the Licensed Products</u>. In furtherance of the terms of paragraph 7 above, Licensee will exercise reasonable efforts to advertise, market and promote the Licensed Products at its own expense and to use its best efforts to sell the Licensed Products in the Territory.

B(4)   <u>Selling Practices</u>. Licensee acknowledges WWE's legitimate and reasonable interest in protecting the value of the Intellectual Property and maximizing the effectiveness of WWE's advertising, promotion and distribution efforts by segmenting the classes of trade into which its licensees sell. Therefore, Licensee will only sell the Licensed Products to a buyer that, to its best knowledge, (i) purchases Licensed Products from Licensee solely for sale directly to the consumer and operates a retail establishment that supports the high quality and image of WWE officially licensed products with appropriate merchandising displays, promotions and/or customer service or (ii) sells to retailers that support the high quality and image of WWE officially licensed products with appropriate merchandising displays, promotions and/or customer service. Licensee acknowledges that a failure to comply with the selling practices set forth in this Section will cause significant harm to WWE efforts to effectively and efficiently distribute WWE related licensed products.

B(5)   <u>Restrictions on the Marketing, Promotion, Advertising and Sale of the Licensed Products</u>.

      a) <u>Prohibition Against Premiums</u>: The term "<u>Premiums</u>" shall mean anything given free or sold at substantially less than its usual selling price (but does not include sales made pursuant to periodic price reductions resulting from "specials," "sales" or volume pricing discounts authorized by WWE) for the purpose of increasing the sale of, or publicizing, any product or service, or such other giveaway or promotional purposes, which includes by way of example and not limitation self-liquidating offers, joint merchandising programs, door openers, traffic builders, uses of Licensed Products as sales force or trade incentives and sales of Licensed Products through distribution schemes involving earned discounts or "bonus" points based on the consumer's use of the offeror's products or service. Licensee acknowledges and agrees that it shall not use the Licensed Products as a "Premium" in any form or manner whatsoever, without the prior written approval of WWE and in each and every instance which approval has been given, it is understood that a separate WWE premium agreement will be

15

entered into between the parties.  Nothing in this Agreement will prohibit Licensee from marketing Licensed Products using creative techniques consistent with industry practice, including periodic specials, sales, or volume discount prices, so long as all receipts are accounted for in Net Sales and in the royalty payments/statements regarded by this Agreement. Any and all rights relative to "Premiums" as it concerns the Licensed Products are specifically reserved by and for WWE's use and WWE will have the right to exploit such "Premiums," without any compensation due Licensee and without WWE or any third party affiliated with WWE being in breach of any of the terms of this Agreement.

b) <u>Promotions; Sweepstakes for the Licensed Products</u>.   Under no circumstances will lotteries, games of chance, sweepstakes or any such other contest or similar type of promotion ("Promotions") be permitted in connection with the Licensed Products without the advance written approval of WWE.  In the event WWE approves such Promotions for Licensee, it is understood that Licensee will be responsible for (i) compliance with all Federal, State and local rules and regulations concerning the Promotions, (ii) implementation and administration of the Promotion including collection of any and all the entries related thereto, the selection of the winners and awarding the prizes; and (iii) the completion of any such other element of the Promotions in order to ensure its fulfillment.

c) <u>Prohibition Against Modifying Licensed Products</u>:   Licensee will not manufacture, sell or distribute the Licensed Products to any party or entity who changes, alters, or adds to the Licensed Products in any manner whatsoever and then resells or distributes the Licensed Products to retailers, wholesalers, vendors or the general public, unless approved in advance in writing by WWE.

B(6)   <u>Compliance</u>.

a) Licensee will manufacture, sell, promote, advertise and distribute the Licensed Product(s) in a legal and ethical manner and in accordance with the terms and intent of this Agreement.  To that end, Licensee agrees on behalf of itself, its manufacturers, distributors, agents and/or representatives (collectively referred to throughout the remainder of this subsection B(6) as "Licensee") to adhere to (and ensure compliance by its manufacturers, distributors, agents and/or representatives) the following Code of Conduct:

ETHICAL STANDARDS.  Licensee shall conduct their business in accordance with the highest standards of ethical behavior.

COMPLIANCE WITH APPLICABLE LAWS.   Licensee shall comply with all applicable laws and regulations of the countries, states and localities in which they operate.

EMPLOYMENT PRACTICES.  WWE will only do business with Licensees whose employees are appropriately compensated, present at work voluntarily, not at undue risk of physical harm and not exploited in any way.  In addition, Licensee must comply with the following specific standards:

16

- Wages and Benefits: Licensee shall provide wages, overtime compensation and benefits at not less than the minimum levels required by applicable laws and regulations or the prevailing local industry levels, if higher.

- Working Hours: Licensee shall, at a minimum, comply with all applicable working hours laws and regulations. Except in unusual business circumstances, employees shall not be required to work more than the lesser of (a) 48 hours per week and 12 hours of overtime or (b) the limits on regular and overtime hours allowed by local law or, where local law does not limit the hours of work, the regular work week in such locality plus 12 hours of overtime. In addition, except in unusual business circumstances, employees shall be entitled to at least one day off every seven-day period.

- Child Labor: Licensee shall not employ any person under the age of 15 (or 14 where allowed by local law) or under the local age for completing compulsory education, if higher.

- Forced Labor: Licensee shall not use any forced labor, whether in the form of prison labor, indentured labor, bonded labor or otherwise.

- Harassment or Abuse: Licensee shall treat each employee with dignity and respect, and shall not use corporal punishment, threats of violence or other forms of physical, sexual, psychological or verbal harassment or abuse.

- Nondiscrimination: Licensee shall not discriminate in employment practices on the basis of race, religion, age, nationality, social or ethnic origin, gender, sexual orientation, political opinion or disability.

- Freedom of Association: Licensee shall recognize and respect the right of employees to join organizations of their own choosing and shall neither threaten nor penalize employees for their efforts to organize or bargain collectively.

- Health and Safety: Licensee shall provide employees with a safe and healthy working environment. Manufacturing facilities shall, at a minimum, contain clean restrooms, potable water, adequate lighting, adequate ventilation and fire exits. Residential facilities, if provided, shall also be kept sanitary and safe.

ENVIRONMENTAL REQUIREMENTS. Licensee shall comply with all applicable environmental laws and regulations.

COMMUNICATION.   Licensee shall take appropriate steps to ensure that the provisions of this Code are communicated to employees, including the prominent posting of the Code (in the local language) in their manufacturing facilities.

MONITORING AND COMPLIANCE.  Licensee shall conduct periodic audits of manufacturing facilities, on the basis of which they shall certify to WWE on request either that (a) all products and services furnished to WWE have been furnished in compliance with this

17

Code, or (b) identified facilities have been found not to be in compliance with this Code, in which event the Licensee shall specify appropriate and effective steps to remedy the non-compliance. WWE or its representatives are authorized to engage in monitoring activities to confirm compliance with this Code, including on-site inspections of manufacturing facilities and residential facilities, audits of records relating to employment matters and private interviews with employees at all levels. Licensee shall retain and make available to WWE or its representatives, either on site or at agreed upon locations, all documentation that may be required to assess whether or not the Licensee is in compliance with this Code.

FAILURE TO COMPLY. WWE reserves the right, in addition to all other legal and contractual rights, to terminate its relationship with any Licensee found to be in violation of this Code.

b) Licensee will furthermore at all times conduct all aspects of its business in a fair and reasonable manner and in compliance with all shipment tracking, identification and anti-counterfeiting systems and labels (See Section 8) that WWE may establish from time to time and all applicable laws, government rules and regulations, court and administrative decrees and the highest standard of business ethics then prevailing in the industry. Licensee will use its commercially reasonable efforts to ensure that all channels of distribution purchasing Licensed Products comply with the current WWE anti-counterfeiting systems and labels established and as from time to time thereafter amended by WWE.

c) It will be Licensee's sole responsibility, at its sole expense, to obtain all approvals (including approvals of certain Licensed Products and/or Advertising Materials) of all governmental authorities which may be necessary in connection with Licensee's performance under this Agreement.

d) Licensee acknowledges and fully understands the following meanings established for "Counterfeit Goods", "Diverted Goods" and "Parallel Goods":

- "Counterfeit Goods" shall mean and include by way of example and not limitation (i) any goods, material, product or otherwise that bear any Intellectual Property that has been reproduced and/or affixed thereto without authorization from WWE; (ii) goods that bear any Intellectual Property produced for any source in excess of the amount ordered by WWE licensee or designated customer or distributor; and (iii) any goods that bear any Intellectual Property, hereto that has been rejected by or never approved by WWE and nevertheless entered into the stream of commerce.

- "Diverted Goods" shall mean and include any goods produced by someone acting on behalf of Licensee, wherein such goods are not delivered by the producer to Licensee or to a person designated by such Licensee to receive such goods.

- "Parallel Goods" shall mean and include Licensed Products transferred outside of the Territory or brought into the Territory in violation of this Agreement.

Licensee will use all commercially reasonable means to prevent the recreation of any Counterfeit Goods, Diverted Goods, and/or Parallel Goods involving Intellectual Property by

18

its employees, agents, representatives or any others operating under its direction, supervision or control. Licensee will stamp on all invoices a prominent legend that states that the Licensed Products are allowed to be sold only within the Territory and only to an end user. Licensee will periodically, and at the request of WWE, inquire of its authorized distributors, agents and customers as to whether they are observing territorial limits and will periodically report in writing to WWE the results of such inquiries. If Licensee actually knows (or had a reasonable basis to suspect) that any Licensed Product sold by Licensee is being resold outside the Territory (i.e. Counterfeit Goods, Diverted Good and/or Parallel Goods), Licensee will compensate WWE for the injury to its licensing and distribution program and will pay all costs and expenses, including attorney's fees, required to remove such goods from the marketplace and/or permanently restrain Licensee's customer from further unauthorized sale of Licensed Product. Any such monetary damages will be in addition to, and not in lieu of, such other rights and relief (including injunctive relief) as may be available to WWE. Licensee will incorporate within its contracts of sale or sales orders a provision similar in substance to the terms of this Section and which provides that the obligations set forth in this Section will be a continuing obligation on the re-sale of the Licensed Products to subsequent authorized wholesale purchases and which makes WWE a third party beneficiary of such provisions.

## SECTION C.   ROYALTY STATEMENTS AND PAYMENTS

C(1)   Computation of Royalties.   All royalties due WWE shall accrue upon the sale of the Licensed Products, regardless of the time of collection by the Licensee. For purposes of this Agreement, a Licensed Product shall be considered "sold" as of the date on which such Licensed Product is billed, invoiced, shipped, processed or paid for, whichever event occurs first. If any Licensed Products are consigned to a distributor by the Licensee, the Licensed Products shall be considered "sold" by the Licensee upon the date on which such distributor bills, invoices, ships, processes or receives payment for any of the Licensed Products, whichever occurs first.

C(2)   Time of Payment.   All royalty payments shall be made in accordance with the mandatory payment schedule set forth in Paragraph 4 of this Agreement and/or as otherwise directed in Section C(5) below. All royalty amounts in this Agreement are stated in U.S. Dollars and all royalty payments shall be made in U.S. Dollars. All royalty statements required to be submitted by the Licensee shall accompany the royalty payments made to WWE. The failure to make royalty payments when due is a material breach and cause for immediate termination of this Agreement if not received by WWE within five (5) days of written notice of default sent to Licensee by WWE.

C(3)   WWE Approval of Discounted Sales.   If the Licensee proposes to sell any Licensed Product at a price which is less than ten percent (10%) above the Licensee's manufactured cost for such Licensed Products, WWE shall have a right of prior approval over the terms of such sale and the percentage royalty to be payable to Licensee with respect to such sale.

C(4)   Deductions; Taxes.

a) There shall be no deduction from the royalties owed to WWE for uncollectible accounts or for taxes (such as value added taxes or goods and services taxes), and for fees, assessments, quotas, licenses, contingents, commissions, import or export taxes, import or expert permits, similar levies, fees or charges imposed or levied or any other expenses of any kind which may be incurred or paid by WWE or the Licensee in connection with: (i) royalty payments to WWE; (ii) the manufacture, sale, distribution, or advertising of the Licensed Products in the Territory; or (iii) the transfer of funds or royalties or the conversion of any currency into U.S. Dollars. It shall be the Licensee's sole responsibility at its expense to obtain the approval of any foreign authorities; to take whatever steps may be required to effect the payment of funds from abroad; to minimize or eliminate the incidence of foreign taxes, fees, or assessments which may be imposed; to protect its investments in foreign territories; to enable it to commence or continue doing business in any foreign territory; and to comply in any and all respects with all applicable laws and regulations.

b) Notwithstanding the provisions of the preceding Section C(4)(a), if (i) any country imposes a withholding tax against WWE, as licensor, with respect to the royalties payable to WWE by the Licensee on sales of the Licensed Products in such country, (ii) such tax is paid by the Licensee on behalf of WWE, and (iii) such tax is an income tax as to which a foreign tax credit is allowable to WWE under Section 901 of the Internal Revenue Code of 1986, as amended, the Licensee may deduct the amount of such withholding tax from the royalties owing to WWE on the condition that the Licensee furnishes to WWE such information as WWE requires to evidence WWE's right to credit such withholding tax against its federal income tax liability in the United States.

C(5)    Royalty Statements.    Licensee shall furnish to WWE in the form attached hereto as Schedule A in an Excel format via e-mail, regular mail and via an Internet based digital asset storage and management system within thirty (30) days after the close of each and every Calendar quarter during the Term hereof, as defined in paragraph 4 above, along with any royalty payments then due, if any, full, complete and accurate statements, duly certified by an officer of the Licensee to be true and accurate, showing the number of each type of Licensed Product sold during the Calendar quarter in question, the total gross sales revenues for each such Licensed Product, an itemization of all allowable deductions taken pursuant to the definition of Wholesale Sale Price, if any, the Wholesale Sales Price for each Licensed Product sold, the amount of royalties due with respect to such sales, the quantities of each Licensed Product on hand and in transit as of the end of such quarter, the SKU and/or UPC code for each Licensed Product and all information necessary for the calculation of the Wholesale Sales Price together with such other pertinent information as WWE may reasonably request from time to time. The Licensee's royalty accountings shall identify with specificity the types of Intellectual Property used on or in connection with each Licensed Product sold, including the identities of all Talent appearing on or depicted within each such  Licensed Product. There shall be a breakdown of sales of Licensed Products by country, and all figures and monetary amounts shall first be stated in the currency in which the sales were actually made. If several currencies are involved in any reporting category, that category shall be broken down by each such currency. Next to each currency amount shall be set forth the equivalent amount stated in U.S. Dollars, and the rate of exchange used in U.S. Dollars, and the rate of exchange used in making the required conversion calculation. All computations and

20